**IN THE**
**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

No. 08–1050

ALEXANDER NUXOLL, by his next friends, MICHAEL NUXOLL
and PENNY NUXOLL,

*Plaintiff-Appellant*,

v.

INDIAN PRAIRIE SCHOOL DISTRICT #204, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1586—**William T. Hart**, *Judge.*

Argued April 4, 2008—Decided April 23, 2008[*]

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge*. The plaintiff, a sophomore at Neuqua Valley High School, a large public high school in Naperville, Illinois, has brought suit against the school district and school officials contending that they are violating his right to free speech by forbidding him to make negative comments at school about homosexuality. He moved for a preliminary

---

[*] The opinion is being released in transcript (with the printed version to follow) because the appellant is seeking a preliminary injunction to enable him to engage in an activity scheduled for April 28.

injunction, which was denied, and he appeals the denial. The parties tacitly agree that he is entitled to a preliminary injunction if he has shown a reasonable probability that his right to free speech is being violated. The Supreme Court believes that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); see also *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000). The school has not tried to show that the grant of a preliminary injunction, at least if narrowly drafted, would cause irreparable harm to it. So the balance of harms inclines toward the plaintiff, and therefore the school can prevail only if his claim is demonstrably weak.

A private group called the Gay, Lesbian, and Straight Education Network promotes an annual event called the "Day of Silence" that is intended to draw attention to harassment of homosexuals. See www.dayofsilence.org (visited Apr. 5, 2008). The idea behind the name is that homosexuals are silenced by harassment and other discrimination. The goal of the "Day of Silence" is not to advocate homosexuality but to advocate tolerance for homosexuals. A student club at Neuqua Valley High School called the Gay/Straight Alliance sponsors the "Day of Silence" at the school. Students participate by remaining silent throughout the day except when called upon in class, though some teachers, as part of their own observance of the "Day of Silence," will not call on students participating in the observance. Some students and faculty wear T-shirts that day with legends such as "Be Who You Are." None of the legends advocates homosexuality or criticizes heterosexuality. Indeed, opposition to harassment of persons who happen to be homosexual is consistent with disapproval of homosexuality itself.

The plaintiff is one of the students who disapprove of homosexuality. Some of them participate in a "Day of Truth" (see www.dayoftruth.org (visited Apr. 5, 2008)) held on the first school day after the "Day of Silence." They recommend that supporters wear a T-shirt that reads "day of truth" and "The Truth cannot be silenced." Two years ago a coplaintiff (who has since graduated and as a result is no longer seeking injunctive relief) wore a shirt that read "*My* Day of Silence, Straight Alliance" on the front and "Be Happy, Not Gay" on the back. A school official had the phrase "Not Gay" inked out. Last year neither plaintiff wore a shirt that contained the phrase, or otherwise tried to counter the Day of Silence, for fear of being disciplined.

None of the slogans mentioned so far has been banned by the school authorities except "Be Happy, Not Gay." The school bases the ban on a school rule forbidding "derogatory comments," oral or written, "that refer to race, ethnicity, religion, gender, sexual orientation, or disability." The school deems "Be Happy, Not Gay" a derogatory comment on a particular sexual orientation. The school's position is that members of a listed group may comment favorably about their own group but may not make a derogatory comment about another group. The rule does not apply to comments made outside of school.

The plaintiff challenges the rule, as well as its application in this case. He believes that the First Amendment entitles him to make, whether in school or out, *any* negative comments he wants about the members of a listed group, including homosexuals (a group defined of course by sexual orientation), provided they are not inflammatory words—that is, not "fighting words," words likely to provoke a violent reaction and hence a breach of the peace. The Supreme Court has placed fighting words outside the protection of the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572–73 (1942)

(Jehovah's Witness called a government official "a God damned racketeer" and "a damned Fascist"). Although subsequent invocations of the doctrine have failed, e.g., *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992); *Texas v. Johnson*, 491 U.S. 397, 409–10 (1989); *Cohen v. California*, 403 U.S. 15, 20–21 (1971); *Collin v. Smith*, 578 F.2d 1197, 1204–05 (7th Cir. 1978); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997), the plaintiff concedes its continued validity and further concedes that he could not inscribe "homosexuals go to Hell" on his T-shirt because those are fighting words and so can be prohibited despite their expressive content and arguable theological support. *R.A.V. v. City of St. Paul*, *supra*, 505 U.S. at 386.

The concession is prudent. A heavy federal constitutional hand on the regulation of student speech by school authorities would make little sense. The contribution that kids can make to the marketplace in ideas and opinions is modest and a school's countervailing interest in protecting its students from offensive speech by their classmates is undeniable. Granted, because 18-year-olds can now vote, high-school students should not be "raised in an intellectual bubble," as we put it in *American Amusement Machine Association v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001), which would be the effect of forbidding all discussion of public issues by such students. But Neuqua Valley High School has not tried to do that. It has prohibited only (1) *derogatory* comments on (2) unalterable or otherwise deeply rooted personal characteristics about which most people, including—perhaps especially including—adolescent schoolchildren, are highly sensitive. People are easily upset by comments about their race, sex, etc., including their sexual orientation, because for most people these are major components of their personal identity—none more so than a sexual orientation that deviates from the norm. Such comments can strike a person at the core of his being.

There is evidence, though it is suggestive rather than conclusive, that adolescent students subjected to derogatory comments about such characteristics may find it even harder than usual to concentrate on their studies and perform up to the school's expectations. See David M. Huebner et al., "Experiences of Harassment, Discrimination, and Physical Violence Among Young Gay and Bisexual Men," 94 *Am. J. Public Health* 1200–01 (July 2004); Michael Bochenek & A. Widney Brown, Human Rights Watch, "Hatred in the Hallways: Violence and Discrimination Against Lesbian, Gay, Bisexual, and Transgender Students in U.S. Schools" 1–3 (2001), www.hrw.org/reports/2001/uslgbt/toc.htm (visited Apr. 15, 2008); American Association of University Women Educational Foundation, "Hostile Hallways: Bullying, Teasing, and Sexual Harassment in School" 37 (2001), www.aauw.org/research/upload/hostilehallways.pdf (visited Apr. 14, 2008). Neuqua Valley High School is huge—4200 students—and the potential for wounding speech concerning the personal characteristics listed in the school's rule is great. Nor, on the benefits side of the First Amendment balance, is uninhibited high-school student hallway debate over sexuality—whether carried out in the form of dueling T-shirts, dueling banners, dueling pamphlets, annotated Bibles, or soapbox oratory—an essential preparation for the exercise of the franchise.

A judicial policy of hands off (within reason) school regulation of student speech has much to recommend it. On the one hand, judges are incompetent to tell school authorities how to run schools in a way that will preserve an atmosphere conducive to learning; on the other hand the suppression of adolescents' freedom to debate sexuality is not one of the nation's pressing problems, or a problem that can be solved by aggressive federal judicial intervention. A far more urgent problem, the high dropout rates in many public schools, United

States Department of Education National Center for Education Statistics, "Dropout Rates in the United States: 2005" 3–5 (June 2007), nces.ed.gov/pubs2007/2007059.pdf (visited Apr. 14, 2008), will not be solved by First Amendment free-for-alls, though happily the drop-out rate at Neuqua Valley High School, serving as it does the wealthy city of Naperville, is negligible.

It may not be obvious to an outsider how a T-shirt on which is written the slogan "Be Happy, Not Gay" will poison the school atmosphere, but the outsider is—an outsider. And of course the plaintiff doesn't want to stop there. He wants to wear T-shirts that make more emphatically negative comments about homosexuality, provided only that the comments do not cross the line that separates nonbelligerent negative comments from fighting words, wherever that line may be. He also wants to distribute Bibles to students to provide documentary support for his views about homosexuality. We foresee a deterioration in the school's ability to educate its students if negative comments on homosexuality by students like Nuxoll who believe that the Bible is the word of God to be interpreted literally incite negative comments on the Bible by students who believe either that there is no God or that the Bible should be interpreted figuratively. Mutual respect and forbearance enforced by the school may well be essential to the maintenance of a minimally decorous atmosphere for learning.

But we cannot accept the defendants' argument that the rule is valid because all it does is protect the "rights" of the students against whom derogatory comments are directed. Of course a school can—often it must—protect students from the invasion of their legal rights by other students. But people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life. *R.A.V. v. City of St. Paul, supra*, 505 U.S. at 394; *Boos v. Barry*, 485 U.S. 312, 321 (1988). There is no indication that the negative comments that the plaintiff wants to make about homosexuals or homosexuality names or otherwise

targets an individual or is defamatory. Anyway, though *Beauharnais v. Illinois*, 343 U.S. 250 (1952), has never been overruled, no one thinks the First Amendment would today be interpreted to allow group defamation to be prohibited. *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 331 n. 3 (7th Cir. 1985), aff'd without opinion, 475 U.S. 1001 (1986); *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1200 (9th Cir. 1989).

The school is on stronger ground in arguing that the rule strikes a reasonable balance between the competing interests—free speech and ordered learning—at stake in the case. But the plaintiff tells us that the Supreme Court has placed a thumb on the balance—that it has held that a school unable to prove that student speech will cause "disorder or disturbance," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508 (1969), can ban such speech only if it either is lewd, *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) ("a sexually explicit monologue directed towards an unsuspecting audience of teenage students"), or advocates the consumption of illegal drugs. *Morse v. Frederick*, 127 S. Ct. 2618, 2626–27 (2007). He notes that Justice Alito's concurring opinion in *Morse* (joined by Justice Kennedy) disparages invocation of a school's "educational mission" as a ground for upholding restrictions on high-school students' freedom of speech; the opinion warns that such invocation "strikes at the very heart of the First Amendment," *id.* at 2637, though one may doubt just how close debate by high-school students on sexual preferences really is to the heart of the First Amendment.

The plaintiff calls Justice Alito's concurrence the "controlling" opinion in *Morse* because Justices Alito and Kennedy were part of a five-Justice majority, so that their votes were crucial to the decision. But they joined the majority opinion, not just the decision, and by doing so they made it a majority opinion and not merely, as the plaintiff believes (as

does the Fifth Circuit, *Ponce v. Socorro Independent School District*, 508 F.3d 765, 768 (5th Cir. 2007)), a plurality opinion. *McKevitt v. Pallasch*, 339 F.3d 530, 531–32 (7th Cir. 2003). The concurring Justices wanted to emphasize that in allowing a school to forbid student speech that encourages the use of illegal drugs the Court was not giving schools carte blanche to regulate student speech. And they were expressing their own view of the permissible scope of such regulation.

If the schoolchildren are very young or the speech is not of a kind that the First Amendment protects (both features of our decision in *Brandt v. Board of Education of City of Chicago*, 480 F.3d 460, 465–66 (7th Cir. 2007), which, as the plaintiff correctly notes, distinguishes that case from this one), the school has a pretty free hand. See *id.*; *Muller by Muller v. Jefferson Lighthouse School*, 98 F.3d 1530, 1538–39 (7th Cir. 1996); *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 738 (7th Cir. 1994); *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 389 (6th Cir. 2005); *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416–17 (3d Cir. 2003); *Lovell by Lovell v. Poway Unified School District*, 90 F.3d 367, 373 (9th Cir. 1996). But it does not follow that because those features are missing from this case the school must prove that the speech it wants to suppress will cause "disorder or disturbance," or that it "materially disrupts classwork or involves substantial disorder" or "would materially and substantially disrupt the work and discipline of the school."

All three formulas are found in *Tinker v. Des Moines Independent Community School District*, *supra*, 393 U.S. at 513, but that was a quite different case from this. The school was discriminating against a particular point of view, namely opposition to the Vietnam war expressed by the wearing of black armbands. *Id.* at 510–11. The parallel to *Tinker* in this case would be a rule that forbade negative comments just about heterosexuality or just about homosexuality. And *Tinker*

preceded *Fraser* and *Morse*. Taking the case law as a whole we don't think a school is required to prove that unless the speech at issue is forbidden serious consequences will *in fact* ensue. That could rarely be proved. (*Scott v. School Board of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003), and *West v. Derby Unified School District No. 260*, 206 F.3d 1358, 1365–66 (10th Cir. 2000)—cases that involved the display of the Confederate flag in racially mixed schools—illustrate the rare case.) It is enough for the school to present "facts which might reasonably lead school officials to forecast substantial disruption." *Boucher v. School Board of School District of Greenfield*, 134 F.3d 821, 827–28 (7th Cir. 1998); *Walker-Serrano ex rel. Walker v. Leonard*, *supra*, 325 F.3d at 416; *LaVine v. Blaine School District*, 257 F.3d 981, 989 (9th Cir. 2001).

This tells us what the standard of proof is. But what is "substantial disruption"? Must it amount to "disorder or disturbance"? Must classwork be disrupted and if so how severely? We know from *Morse* that the Supreme Court will let a school ban speech—even speech outside the school premises—that encourages the use of illegal drugs, without the school's having to prove a causal relation between the speech and drug use. We know too that avoiding violence, if that is what "disorder or disturbance" connotes, is not a school's only substantial concern. Violence was not the issue in *Morse,* or in *Fraser*, the lewd-speech case. In fact one of the concerns expressed by the Supreme Court in *Morse* was with the *psychological* effects of drugs. 127 S. Ct. at 2628–29; see also *Canady v. Bossier Parish School Board*, 240 F.3d 437, 443 (5th Cir. 2001); cf. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 656, 661–62 (1995). Imagine the psychological effects if the plaintiff wore a T-shirt on which was written "blacks have lower IQs than whites" or "a woman's place is in the home."

From *Morse* and *Fraser* we infer that if there is reason to think that a particular type of student speech will lead to a

decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school—symptoms therefore of substantial disruption—the school can forbid the speech. The rule challenged by the plaintiff appears to satisfy this test. It seeks to maintain a civilized school environment conducive to learning, and it does so in an even-handed way. It is not as if the school forbade only derogatory comments that refer, say, to religion, a prohibition that would signal a belief that being religious merits special protection. See *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 394 (1993); *R.A.V. v. City of St. Paul*, *supra*, 505 U.S. at 391–92; *Hedges v. Wauconda Community Unit School District No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993). The list of protected characteristics in the rule appears to cover the full spectrum of highly sensitive personal-identity characteristics. And the ban on derogatory words is general. Nuxoll can't say "homosexuals are going to Hell" (though he can advocate heterosexuality on religious grounds) and it cannot be said back to him that "homophobes are closeted homosexuals." The school's rule bans "derogatory comments…that *refer* to race, ethnicity, religion, gender, sexual orientation, or disability."

We grant that a rule which forbids *any* class of remarks, however narrowly defined and whatever the justification, restricts free speech. But that observation is the beginning of the constitutional analysis, not the end. The number of restrictions on freedom of speech that have survived constitutional challenge is legion. This particular restriction, it is true, would not wash if it were being imposed on adults, *id.* at 390; *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995), because they can handle such remarks better than kids can and because adult debates on social issues are more valuable than debates among children. It probably would not wash if it were extended to students when they are outside of the school, where students who would be hurt by the remarks could avoid exposure to them. It would not wash if the

school understood "derogatory comments" to embrace *any* statement that could be construed by the very sensitive as critical of one of the protected group identities. (That may, as we'll see, be a problem with the school's application of its rule to the facts of this case.) But high-school students are not adults, schools are not public meeting halls, children are in school to be taught by adults rather than to practice attacking each other with wounding words, and school authorities have a protective relationship and responsibility to all the students. Because of that relationship and responsibility, we are concerned that if the rule is invalidated the school will be placed on a razor's edge, where if it bans offensive comments it is sued for violating free speech and if it fails to protect students from offensive comments by other students it is sued for violating laws against harassment, as in *Nabozny v. Podlesny*, 92 F.3d 446, 457 (7th Cir. 1996).

We are mindful that the Supreme Court said in *Tinker* that "if a regulation were adopted by school officials forbidding discussion of the Vietnam conflict…it would be obvious that the regulation would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513. But to ban all discussion of the Vietnam war would in reality have been taking sides—would have delighted the government—because the debate over the war was started, maintained, and escalated by the war's opponents.

So the plaintiff is not entitled to a preliminary injunction against the rule. And, his lawyer conceded at oral argument, neither is he entitled to a preliminary injunction against the defendants' forbidding his making "negative comments" about homosexuality short of "fighting words." Not only are such terms too vague to be the operative terms of an injunction, which must contain a detailed and specific statement of its

terms, Fed. R. Civ. P. 65(d)(1)(A), (C); *Schmidt v. Lessard*, 414 U.S. 473, 475–77 (1974) (per curiam); *Hispanics United of DuPage County v. Village of Addison*, 248 F.3d 617, 619–20 (7th Cir. 2001); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200–01 (11th Cir. 1999), but the plaintiff's lawyer did not propose *any* language to the district judge. A litigant has a feeble claim for a preliminary injunction when he can't articulate what he wants enjoined. Cf. 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949, pp. 212–13 (2d ed. 2007); cf. *Wolgin v. Simon*, 722 F.2d 389, 394–95 (8th Cir. 1983). The plaintiff concedes, therefore, that the most he is entitled to is an injunction that would permit him to stencil "Be Happy, Not Gay" on his T-shirt on the "Day of Truth" because forcing deletion of "Not Gay" stretches the school's derogatory-comments rule too far. We must consider the argument carefully, because the term "derogatory comments" is unavoidably vague. (If a clearer formulation could be substituted, the rule might be invalid because of its vagueness, but the parties do not suggest alternative formulations.)

The expression "Be Happy, Not Gay" is a play on words, since "gay" used to be an approximate synonym for "happy" but now has been appropriated to designate homosexual orientation. One cannot even be certain that it is a "derogatory" comment; for "not gay" is a synonym for "straight," yet the school has told us that it would not object to a T-shirt that said "Be Happy, Be Straight." It wouldn't object because to advocate *X* is not necessarily to disparage *Y*. If you say "drink Pepsi" you may be showing your preference for Pepsi over Coke, but you are not necessarily deriding Coke. It would be odd to call "Be Happy, Drink Pepsi" a derogatory comment about Coke.

But context is vital. Given kids' sensitivity about their sexual orientation and their insensitivity about their preferences in soft drinks, the Pepsi-Coke analogy misses the mark. The plaintiff, like the students who participate in the "Day of

Truth," is expressing disapproval of homosexuality, as everyone knows. No one bothers to talk up heterosexuality who isn't interested in denigrating homosexuality. The plaintiff himself describes "Be Happy, Not Gay" as one of the "negative comments" about homosexuality that he considers himself constitutionally privileged to make. He is in a better position than we are to interpret the meaning of his own comment.

Nevertheless, "Be Happy, Not Gay" is only tepidly negative; "derogatory" or "demeaning" seems too strong a characterization. As one would expect in a school the size of Neuqua Valley High School, there have been incidents of harassment of homosexual students. But it is highly speculative that allowing the plaintiff to wear a T-shirt that says "Be Happy, Not Gay" would have even a slight tendency to provoke such incidents, or for that matter to poison the educational atmosphere. Speculation that it might is, under the ruling precedents, and on the scanty record compiled thus far in the litigation, too thin a reed on which to hang a prohibition of the exercise of a student's free speech. We are therefore constrained to reverse the district court's order with directions to enter forthwith (the "Day of Truth" is scheduled for April 28) a preliminary injunction limited however to the application of the school's rule to a T-shirt that recites "Be Happy, Not Gay." The school has failed to justify the ban of that legend, though the fuller record that will be compiled in the further proceedings in the case may cast the issue in a different light.

And further proceedings there will be. The plaintiff will not be content with the limited relief that we are ordering. This is cause litigation. He will press for a broader injunction as permanent relief, though one that will fall short of permitting him to use fighting words in his fight against homosexuality, for he has conceded that the school can ban fighting words. The district judge will be required to strike a careful balance between the limited constitutional right of a high-school

student to campaign inside the school against the sexual orientation of other students and the school's interest in maintaining an atmosphere in which students are not distracted from their studies by wrenching debates over issues of personal identity.

ROVNER, *Circuit Judge, concurring in the judgment*. I agree that we should reverse and remand this case to the district court with instructions to enter an injunction allowing Nuxoll to wear a shirt bearing the slogan "Be Happy, Not Gay" on the school day following the Day of Silence. I view this as a simple case. We are bound by the rule of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), a case that the majority portrays in such a convoluted fashion that the discussion folds in on itself like a Möbius strip.[1] *Tinker* straight-forwardly tells us that, in order for school officials to justify prohibition of a particular expression of opinion, they must be able to show that this "action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 509. Under *Tinker*, students may express their opinions, even on controversial subjects, so long as they do so "without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." 393 U.S. at 512-13 (*quoting Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).[2] The school district has "not demonstrate[d] any facts which

---

[1]       A Möbius strip is a "continuous, one-sided surface formed by twisting one end of a rectangular strip through 180° about the longitudinal axis of the strip and attaching this end to the other." Webster's Unabridged Dictionary of the English Language, (RHR Press, 2001).

[2]       I will hereafter use the term "substantial disruption" as shorthand for the *Tinker* standard.

might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," and no such disruption occurred two years earlier when Nuxoll's co-plaintiff wore such a shirt to school following the Day of Silence. *Tinker*, 393 U.S. at 514. Therefore, this particular expression must be allowed.

Contrary to the majority's characterization, *Tinker* is not a case about viewpoint discrimination and is not distinguishable from the instant case. *Supra* at 8. *Tinker* involved students who wished to wear black armbands to protest the Vietnam war. School officials would not allow the armbands although they did allow students to wear other symbols of political or controversial significance, including political campaign buttons and the Iron Cross, a symbol that is associated with Nazism. The Court concluded that "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Tinker*, 393 U.S. at 511. *Tinker* reveals nothing about whether the school allowed symbols or other expressions of opinion favorable to U.S. involvement in the Vietnam war, and so there is no reason to read *Tinker* as a case about viewpoint. It is more appropriately characterized as a discussion about subject matter discrimination, although the opinion is not limited to the circumstance where the school has banned all discussion of a particular subject. The majority attempts to turn *Tinker* into a viewpoint case by stating that a school ban on "all discussion of the Vietnam war would in reality have been taking sides," *supra* at 11, because the debate over the war was initiated by those opposed to it. And here is the Möbius strip. Under the majority's reasoning, allowing open debate on any subject would constitute taking the side of the anti-*status quo*. Open debate could never simply be open debate; it would constitute "taking sides," in particular taking the side of the party

opposed to the *status quo.* Open debate is the very value preserved by the First Amendment and yet the majority reduces it to stealth viewpoint expression. The majority expends much ink trying to strike a balance between the interests of free speech and ordered learning, a discussion which sounds remarkably similar to the rule of *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), where the Supreme Court set a balancing rule for school-sponsored speech. This case does not involve school-sponsored speech, and there is no need for us to strike a new balance; the Supreme Court has already set the applicable standard in *Tinker.*

Moreover, I heartily disagree with my brothers about the value of the speech and speech rights of high school students, which the majority repeatedly denigrates. *Supra*, at 4, 5, 7 and 10. Youth are often the vanguard of social change. Anyone who thinks otherwise has not been paying attention to the civil rights movement, the women's rights movement, the anti-war protests for Vietnam and Iraq, and the recent presidential primaries where the youth voice and the youth vote are having a substantial impact. And now youth are leading a broad, societal change in attitude towards homosexuals, forming alliances among lesbian, gay, bisexual, transgendered ("LGBT") and heterosexual students to discuss issues of importance related to sexual orientation. They have initiated a dialogue in which Nuxoll wishes to participate. The young adults to whom the majority refers as "kids" and "children" are either already eligible, or a few short years away from being eligible to vote, to contract, to marry, to serve in the military, and to be tried as adults in criminal prosecutions. To treat them as children in need of protection from controversy, to blithely dismiss their views as less valuable than those of adults, *supra* at 10, is contrary to the values of the First Amendment. Justice Brennan eloquently stated this for the Court more than forty years ago, and his words ring especially true today:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.  The classroom is peculiarly the marketplace of ideas.  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.

*Tinker*, 393 U.S. at 512 (*quoting Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)) (internal citations and quotation marks omitted).  *See also Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1055 (7th Cir. 2004) ("The strength of our democracy depends on a citizenry that knows and understands its freedoms, exercises them responsibly, and guards them vigilantly. Young adults . . . are not suddenly granted the full panoply of constitutional rights on the day they attain the age of majority. We not only permit but expect youths to exercise those liberties-to learn to think for themselves, to give voice to their opinions, to hear and evaluate competing points of view-so that they might attain the right to vote at age eighteen with the tools to exercise that right.")  The majority also treats the subject matter of sexual orientation as lacking importance, apparently failing to notice that, for the last decade or two, state and national legislatures have been awash with debates over the limits placed on the rights of LGBT persons, and that presidential candidates are often subjected to litmus tests on these very issues.  Finally, there may be no more important time than adolescence for individuals to contemplate issues relating to their sexual identity.  These are important issues and the voices of young adults add much to the discussion.[3]

---

[3]     The majority also mischaracterizes the plaintiff's position as one seeking the outer limits of the *Chaplinsky* "fighting words" doctrine.  *See*

My brothers also wonder whether this slogan is actually derogatory, noting that it is a play on the words "happy" and "gay." *Supra* at 12. That it is a play on words does not change its ultimate meaning, however. Nuxoll tells us that he intends the slogan to convey the message that "homosexual behavior is contrary to the teachings of the bible, damaging to the participants and society at large, and does not lead to happiness." Throughout his brief, he claims to be criticizing homosexual "conduct" and "behavior" although his four-word polemic "Be Happy, Not Gay" does little to convey this message and instead seems to attack homosexual identity. Nonetheless, the statement is clearly intended to derogate homosexuals. Teenagers today often use the word "gay" as a generic term of disparagement. They might say, "That sweater is so gay" as a way of insulting the look of the garment. In this way, Nuxoll's statement is really a double-play on words because "gay" formerly meant "happy" in common usage, and now "gay," in addition to meaning "homosexual" is also often used as a general insult. Nuxoll's statement easily fits the school's definition of "disparaging" and would meet that standard for most listeners. Moreover, the idea that "not gay" is a synonym for "straight," *supra* at 12, fails to recognize the many nuances of sexual orientation that have been apparent since 1948, when Alfred Kinsey first set forth his zero-to-six Kinsey Scale, defining a continuum of sexuality from exclusively heterosexual on one end to exclusively homosexual

---

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942). True, the plaintiff ultimately seeks to expand the limits of his speech regarding his religious views of homosexuality, but he concedes that he is limited by *Tinker*, not *Chaplinsky*. Moreover, at oral argument, he limited his request for relief at this stage to a preliminary injunction that would allow him to wear his "Be Happy, Not Gay" shirt on the day following the Day of Silence. There is no need for us to address the policy as a whole or any other speech at this point in the litigation. I therefore reserve for another time my own grave doubts as to the Constitutionality of the school's policy on its face.

on the other end. I scarcely know where to begin with the Pepsi/Coke analogy and even the majority seems to realize the comparison misses the mark. I would add that it misses the mark by a rather wide margin. In any case, there is no doubt that the slogan is disparaging. That said, it is not the kind of speech that would materially and substantially interfere with school activities. I suspect that similar uses of the word "gay" abound in the halls of Neuqua Valley High School and virtually every other high school in the United States without causing any substantial interruption to the educational process. There is a significant difference between expressing one's religiously-based disapproval of homosexuality and targeting LGBT students for harassment. Though probably offensive to most LGBT students, the former is not likely by itself to create a hostile environment. Certainly, this is not a case like *Nabozny v. Podlesney*, 92 F.3d 446 (7th Cir. 1996), where students repeatedly called a gay classmate a "faggot," struck him, spit on him, threw him into a urinal, beat him to such a degree that he suffered internal bleeding, and subjected him to a mock rape in a classroom while a few dozen people looked on and laughed at him. So severe and constant and enduring was his classmates' abuse, that Nabozny twice attempted suicide. The defendants here are unlikely to find themselves on the "razor's edge" of *Nabozny, supra* at 11, as a result of Nuxoll's t-shirt.

And what lesson would we teach young adults about the importance of our Constitutional rights if the judiciary took the "hands off" approach to school regulation of speech favored by my brothers? *Supra* at 5.[4] This time I turn to Justice Jackson, speaking for the Court more than sixty years ago:

---

[4]     The majority limits its suggested "hands off" approach with the words "within reason" but seems to approve much broader discretion for school authorities than *Tinker* or its progeny would allow.

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures – Boards of Education not excepted.  These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights.  That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (*quoted in Tinker*, 393 U.S. at 507).  The First Amendment provides the school with an opportunity for a discussion about the values of free speech and respect for differing points of view but it does not grant a license to shut down dissension because of an "undifferentiated fear or apprehension of disturbance." *Tinker*, 393 U.S. at 508.  Contrary to the majority's view that "free speech and ordered learning" are "competing interests," *supra* at 7, I would argue that these values are compatible.  The First Amendment as interpreted by *Tinker* is consistent with the school's mission to teach by encouraging debate on controversial topics while also allowing the school to limit the debate when it becomes substantially disruptive.  Nuxoll's slogan-adorned t-shirt comes nowhere near that standard.  For all of these reasons, I respectfully concur in the judgment.