THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

L. M., A MINOR, BY AND THROUGH HIS FATHER AND STEPMOTHER AND NATURAL GUARDIANS, CHRISTOPHER AND SUSAN MORRISON *v.* TOWN OF MIDDLEBOROUGH, MASSACHUSETTS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 24–410.    Decided May 27, 2025

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, dissenting from the denial of certiorari.

In *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), this Court held that public-school officials may not restrict a student's freedom of speech unless his behavior "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.*, at 513. I have previously explained why *Tinker*'s holding is "without basis in the Constitution" and should be "dispense[d] with . . . altogether." *Morse* v. *Frederick*, 551 U. S. 393, 410, 422 (2007) (concurring opinion); see *id.*, at 410–422; *Mahanoy Area School Dist.* v. *B. L.*, 594 U. S. 180, 216–217 (2021) (dissenting opinion). But, unless and until this Court revisits it, *Tinker* is binding precedent that lower courts must faithfully apply.

For the reasons explained by JUSTICE ALITO, the First Circuit decision below flouts *Tinker* and its progeny. *Post*, at 6–13 (opinion dissenting from denial of certiorari). Petitioner L. M. plainly did not create a "materia[l] disrupt[ion]," *Tinker*, 393 U. S., at 513, by wearing t-shirts reading "There Are Only Two Genders"—and, later, after his school barred that shirt—"There Are CENSORED Genders," 103 F. 4th 854, 860 (2024). In holding otherwise, the First Circuit distorted this Court's First Amendment case law in significant ways that warrant this Court's review. I therefore join JUSTICE ALITO's opinion and respectfully dissent from the denial of certiorari.

# SUPREME COURT OF THE UNITED STATES

L. M., A MINOR, BY AND THROUGH HIS FATHER AND
STEPMOTHER AND NATURAL GUARDIANS, CHRISTOPHER
AND SUSAN MORRISON *v.* TOWN OF
MIDDLEBOROUGH, MASSACHUSETTS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 24–410.   Decided May 27, 2025

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

This case presents an issue of great importance for our Nation's youth: whether public schools may suppress student speech either because it expresses a viewpoint that the school disfavors or because of vague concerns about the likely effect of the speech on the school atmosphere or on students who find the speech offensive. In this case, a middle school permitted and indeed encouraged student expression endorsing the view that there are many genders. But when L. M., a seventh grader, wore a t-shirt that said "There Are Only Two Genders," he was barred from attending class. And when he protested this censorship by blocking out the words "Only Two" and substituting "CENSORED," the school prohibited that shirt as well.

The First Circuit held that the school did not violate L. M.'s free-speech rights. It held that the general prohibition against viewpoint-based censorship does not apply to public schools. And it employed a vague, permissive, and jargon-laden rule that departed from the standard this Court adopted in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969).

The First Circuit's decision calls out for our review.

# I

## A

In March of 2023, L. M. was a seventh grader at Nichols Middle School (NMS or the School) in Middleborough, Massachusetts. Inside and outside the classroom, NMS promotes the view that gender is a fluid construct and that a person's self-defined identity—not biological sex—determines whether that person is male, female, or something else. See App. to Pet. for Cert. 98a–99a, 125a–126a. NMS also encourages students to embrace and express this viewpoint, including during the school's "PRIDE Spirit Week." *Id.*, at 119a; see also *id.*, at 101a–102a.

L. M., however, sees things differently. His "understanding of basic biology" has led him to believe that "there are only two sexes, male and female, and that a person's gender . . . is inextricably tied to sex." *Id.*, at 90a. Nor is L. M. alone in this regard. Several of his peers take issue with NMS's position on questions of human identity, sex, and gender, but they remain silent due to the social consequences of disagreeing with the School's authority figures. *Id.*, at 99a–100a, 126a.

To register his dissent and start a dialogue on the topic, L. M. wore a shirt to school that read, "There Are Only Two Genders." 103 F. 4th 854, 860 (CA1 2024). But NMS censored L. M.'s speech no sooner than it started.

The school principal removed L. M. from his first-period gym class after a teacher called to report the shirt. The teacher expressed concern for the "physical safety" of the student body and claimed that "multiple members of the LGBTQ+ population at NMS . . . would be impacted by the t-shirt message" and could "potentially disrupt classes." Joint App. in No. 23–1535 etc. (CA1), p. 86. After haling L. M. into her office, the principal explained that other students had "complained" that the shirt "made them upset." App. to Pet. for Cert. 103a, 127a. She then told L. M. that he could not return to class unless he changed clothes.

L. M. declined, so he was sent home.

A week and a half later, L. M.'s father emailed the superintendent of the Middleborough Public School System and inquired why his son could not wear the "Two Genders" shirt. L. M.'s father noted that the shirt was not "directed to any particular person" and "simply stated [L. M.'s] view on a . . . topic that is being discussed in social media, schools, and churches all across our country." *Id.*, at 121a. He also pointed out that many NMS students make political statements "every day" through "their choice of clothes, pins, posters, and speech." *Ibid.*; see, *e.g.*, Reply Brief 12 (NMS social-media post featuring a student wearing a shirt that reads, "HE SHE THEY IT'S ALL OKAY"). L. M.'s father explained that L. M. just wanted to do the same. In response, the superintendent explained that the shirt violated the school dress code by "target[ing] students of a protected class; namely in the area of gender identity." App. to Pet. for Cert. 122a.

Frustrated that he was not allowed to express his views on an issue of personal and national concern—especially when other students and NMS officials routinely espouse the opposite position during school hours—L. M. wore a redacted version of the shirt in protest. It read: "There Are CENSORED Genders." 103 F. 4th, at 860. But this shirt fared no better. Moments after L. M. arrived to his first class, he was summoned to the principal's office and told that the "CENSORED" shirt was also banned. Rather than miss another day of school, L. M. acquiesced and changed clothes.

B

L. M., by and through his parents and natural guardians, filed suit under Rev. Stat. §1979, 42 U. S. C. §1983, in the District of Massachusetts against the town, school committee, superintendent, and principal. He alleged violations of

his First and Fourteenth Amendment rights and, as relevant here, claimed that NMS engaged in viewpoint discrimination and breached his free-speech rights under this Court's decision in *Tinker*. Soon after filing the complaint, L. M. moved for a preliminary injunction.

The District Court denied relief. See 677 F. Supp. 3d 29, 41 (2023). It acknowledged that students retain their First Amendment rights while at public school. But under *Tinker*, the District Court explained, the Constitution allows schools to restrict student expression that (1) "'materially disrupts classwork or involves substantial disorder'" or (2) "'inva[des] . . . the rights of others.'" 677 F. Supp. 3d, at 37 (quoting *Tinker*, 393 U. S., at 513). The District Court then concluded that L. M.'s shirts ran afoul of *Tinker*'s "rights of others" limitation. With respect to the first shirt, the court reasoned that the "[s]chool administrators were well within their discretion to conclude that" gender-nonconforming students "have a right to attend school without being confronted by messages attacking their identities," and L. M.'s "Two Genders" shirt "may communicate that only two gender identities—male and female—are valid, and any others are invalid or nonexistent." 677 F. Supp. 3d, at 38. With respect to the second shirt, the court found that the NMS administrators "could reasonably conclude" that the "CENSORED" shirt "did not merely protest censorship but conveyed the 'censored' message and thus invaded the rights of the other students" too. *Id.*, at 39.

At the parties' request, the District Court converted its preliminary-injunction decision into a final judgment, and L. M. appealed. L. M. argued that his expression did not target or harass any particular student, that NMS administrators lacked sufficient evidence to reasonably predict that the shirts would cause a material disruption, and that NMS could neither suppress his speech for viewpoint-based reasons nor condone a heckler's veto of his speech.

On appeal, the First Circuit affirmed on an alternative ground. See 103 F. 4th 854. Instead of holding that the shirts infringed the "rights of others," as had the District Court, the First Circuit relied on the other justification mentioned in *Tinker*: speech that "materially disrupts classwork or involves substantial disorder." 393 U. S., at 513. The court acknowledged that L. M.'s shirts—like the black armbands in *Tinker*—expressed his views "passively, silently, and without mentioning any specific students." 103 F. 4th, at 860. But the court saw a material difference between L. M.'s speech and that of the students in *Tinker*. According to the First Circuit, L. M.'s expression—unlike the speech in *Tinker*—"demean[ed] characteristics of personal identity, such as race, sex, religion, or sexual orientation" that "other students at the school share." 103 F. 4th, at 860, 867. After surveying decisions from other Circuits that have encountered similar situations, the First Circuit fashioned a bespoke two-pronged test to apply in this context:

> "[S]chool officials may bar passive and silently expressed messages by students at school that target no specific student if: (1) the expression is reasonably interpreted to demean one of those characteristics of personal identity, given the common understanding that such characteristics are unalterable or otherwise deeply rooted and that demeaning them strike[s] a person at the core of his being; and (2) the demeaning message is reasonably forecasted to poison the educational atmosphere due to its serious negative psychological impact on students with the demeaned characteristic and thereby lead to symptoms of a sick school—symptoms therefore of substantial disruption." *Id.*, at 873–874 (citations and internal quotation marks omitted).

When both prongs are satisfied, the First Circuit explained, a court can be confident "that speech is being barred only

for reasons *Tinker* permits and not merely because it is 'offensive' in the way that a controversial opinion always may be." *Id.*, at 874 (citing *Tinker*, 393 U. S., at 509).

Applying this standard to the facts at hand, the First Circuit resolved both prongs in favor of the School. Specifically, it determined (1) that NMS reasonably interpreted L. M.'s shirts as asserting that anyone who identifies as anything other than male or female is "'invalid or nonexistent,'" which would "demean the identity of transgender and gender-nonconforming NMS students"; and (2) such an affront on the very "existence" of these students would "'materially disrupt [their] ability to focus on learning.'" 103 F. 4th, at 879–883. In making the latter determination, the court deferred to the School's prior experiences with the "'LGBTQ+ population at NMS,'" particularly "the serious nature of the struggles, including suicidal ideation, that some of those students had experienced." *Id.*, at 882. Given the "'vulnerability'" of these students, the court saw no reason to second guess NMS's prediction that the shirts "would so negatively affect the[ir] psychology" that their academic performance and class attendance would decline. *Ibid.*

Finally, the First Circuit sidestepped L. M.'s viewpoint-discrimination arguments. Rather than fully engage with those arguments on the merits, the court, in a footnote, declined to import this Court's broader viewpoint-discrimination jurisprudence into the school context. See *id.*, at 883, and n. 9; see also *id.*, at 886, n. 11.

## II

I would grant the petition for two reasons.

First, we should reaffirm the bedrock principle that a school may not engage in viewpoint discrimination when it regulates student speech. *Tinker* itself made that clear. See 393 U. S., at 511 ("Clearly, the prohibition of expression of one particular opinion . . . is not constitutionally permissible"). Curiously, however, the First Circuit declined to

follow *Tinker* in this regard, instead cherry-picking which First Amendment principles it thought worthy of allowing through the schoolhouse gates. By limiting the application of our viewpoint-discrimination cases, the decision below robs a great many students of that core First Amendment protection.

Second, we should also grant review to determine whether the First Circuit properly understood the rule adopted in *Tinker* regarding the suppression of student speech on the ground that it presents a risk of material disruption. We have described this standard as "demanding." *Mahanoy Area School Dist.* v. *B. L.*, 594 U. S. 180, 193 (2021). But the First Circuit fashioned a rule that is anything but. The lower courts are divided on how to apply *Tinker*'s "material disruption" standard in a context like this one,[1] and the decision below underscores the pressing need for clarification.

## A

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police*

---

[1] See, *e.g.*, *Zamecnik* v. *Indian Prairie School Dist. No. 204*, 636 F. 3d 874, 875 (CA7 2011) (upholding a student's right to wear a shirt that read, "Be Happy, Not Gay"); *Nuxoll* v. *Indian Prairie School Dist. No. 204*, 523 F. 3d 668, 670 (CA7 2008) (same); *Sypniewski* v. *Warren Hills Regional Bd. of Educ.*, 307 F. 3d 243, 246 (CA3 2002) (upholding a student's right to wear a shirt "inscribed with 'redneck' jokes"); see also *Harper ex rel. Harper* v. *Poway Unified School Dist.*, 445 F. 3d 1166, 1171 (CA9 2006) (upholding a school's ban of a shirt that read, "HOMOSEXUALITY IS SHAMEFUL"), vacated as moot, 549 U. S. 1262 (2007); *Parents Defending Education* v. *Olentangy Local School Dist. Bd. of Educ.*, 109 F. 4th 453, 464 (CA6) (holding that a school could satisfy *Tinker*'s material-disruption standard by relying on "common-sense conclusions based on human experience" to punish students for the "dehumanizing and humiliating effects of non-preferred pronouns" (internal quotation marks omitted)), reh'g en banc granted, 120 F. 4th 536 (CA6 2024).

*Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). Otherwise, the government could purge entire topics from the public discourse. And as our cases recognize, these freedom-of-speech harms become "all the more blatant" when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995).

Nor is there a carveout from this principle for controversial, offensive, or disfavored views. For example, we recently held unconstitutional a statute prohibiting the registration of "immoral or scandalous" trademarks, explaining that "a law disfavoring 'ideas that offend'" is "the 'essence of viewpoint discrimination.'" *Iancu* v. *Brunetti*, 588 U. S. 388, 393, 396 (2019) (quoting *Matal* v. *Tam*, 582 U. S. 218, 223, 249 (2017)). Indeed, the presumption against viewpoint discrimination is of such importance to our constitutional order that we have even applied it to categories of speech—like fighting words—that do not enjoy full First Amendment protection. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 391 (1992). So, for example, Congress could ban all fighting words, but it could not ban only those fighting words directed toward Protestants.

Unsurprisingly, the viewpoint-neutrality rule also applies to student speech. Students do not relinquish their First Amendment rights at school, see *Tinker*, 393 U. S., at 506, and by extension, a school cannot censor a student's speech merely because it is controversial, see *Mahanoy*, 594 U. S., at 190. As *Tinker* itself made clear, the viewpoint-neutrality rule plays an important role in safeguarding students' First Amendment right to express an "unpopular viewpoint" at school. 393 U. S., at 509. There, in holding unconstitutional the decision to prohibit students from wearing black armbands to protest the Vietnam War, we emphasized that the school authorities "did not purport to

prohibit the wearing of all symbols of political or controversial significance." *Id.*, at 510. "[S]tudents in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism." *Ibid.* The schools allowed this speech but not the armbands. We concluded that such viewpoint discrimination "is not constitutionally permissible." *Id.*, at 511.

L. M. raised a viewpoint-discrimination argument below. See Brief for Appellant in No. 23–1535 etc. (CA1), pp. 54–55, 64. Namely, he argued that NMS had endorsed and favored the expression of the view that "gender is identity-based" while "barring [his] contrary view that gender is sex-based." *Id.*, at 55. L. M. also noted our recent reaffirmation of the viewpoint-neutrality principle in cases like *Matal* v. *Tam* and *Iancu* v. *Brunetti.* Yet the First Circuit rejected that important argument in a footnote, stating: "We see no reason to take up L.M.'s invitation to be, as far as we can tell, the first court to import recent decisions that clearly did not contemplate the special characteristics of the public-school setting into that setting." 103 F. 4th, at 883, n. 9 (citing *Matal*, 582 U. S. 218; *Iancu*, 588 U. S. 388); see also 103 F. 4th, at 886, n. 11.

The court below erred, and badly so: the rule that viewpoint-based restrictions on speech are almost never allowed is not a new principle proclaimed only in "recent decisions" like *Matal* or *Iancu.* 103 F. 4th, at 883, n. 9. To the contrary, viewpoint neutrality has long been seen as going to "the very heart of the First Amendment." *Morse* v. *Frederick*, 551 U. S. 393, 423 (2007) (ALITO, J., concurring); cf. *Rosenberger*, 515 U. S., at 829–830. The First Circuit was wrong to expel this bedrock constitutional safeguard from our schools.[2]

—————

[2] See *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943) (explaining that teachers and administrators cannot "prescribe what

B

The First Circuit also watered down the test adopted in *Tinker* for determining whether a school's restriction of student speech is allowed. Because free speech is the default and censorship the exception, *Tinker* set forth a "demanding standard." *Mahanoy*, 594 U. S., at 193. We held that a school can restrict speech when it has "evidence" that such restrictions are "necessary" to "avoid material and substantial interference with schoolwork or discipline."[3] *Tinker*, 393 U. S., at 511. Thus, absent a "specific showing" of such a disruption—like "threats or acts of violence on school premises"—this justification for suppressing student speech does not apply. *Id.*, at 508, 511.

Under this standard, NMS had no right to censor L. M. Like the black armbands in *Tinker*, L. M.'s shirts were a "silent, passive expression of opinion, unaccompanied by

shall be orthodox in politics, nationalism, religion, or other matters of opinion"); *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 681 (1986) (affirming the "undoubted freedom to advocate unpopular and controversial views in schools and classrooms"); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 511 (1969) ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved"); *Morse*, 551 U. S., at 409 (rejecting the argument that student "speech is proscribable [when] it is plainly 'offensive'" because "much political and religious speech might be perceived as offensive to some"); *Mahanoy Area School Dist.* v. *B. L.*, 594 U. S. 180, 190 (2021) ("[S]chools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it'"); *id.*, at 210 (ALITO, J., concurring) ("Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting"); *Lee* v. *Weisman*, 505 U. S. 577, 590 (1992) ("To endure the speech of false ideas or offensive content and then to counter it is part of learning how to live in a pluralistic society, a society which insists upon open discourse").

[3] *Tinker* also carves out student speech that "inva[des] . . . the rights of others," 393 U. S., at 513, but the First Circuit did not rely on that aspect of *Tinker*.

any disorder or disturbance on the part of petitione[r]." *Id.*, at 508. And just as in *Tinker*, some of L. M.'s classmates found his speech upsetting. Feeling upset, however, is an unavoidable part of living in our "often disputatious" society, and *Tinker* made abundantly clear that the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is no reason to thwart a student's speech. *Id.*, at 509. True, NMS also forecasted that L. M.'s shirts could lead to a "standoff" between students who support L. M.'s view and those who oppose it. 103 F. 4th, at 880. But the schools in *Tinker* were similarly worried that students "would wear arm bands of other colors" and that this could "evolve into something which would be difficult to control." 393 U. S., at 509, n. 3 (internal quotation marks omitted). If anything, the risk in *Tinker* was far less speculative than in this case. In *Tinker*, several students had already "made hostile remarks to the children wearing armbands," *id.*, at 508, and a math teacher "had his lesson period practically 'wrecked' chiefly by disputes with Mary Beth Tinker" over her armband, *id.*, at 517 (Black, J., dissenting). Even so, *Tinker* deemed the schools' concern an "undifferentiated fear" that could not "overcome the right to freedom of expression." *Id.*, at 508 (majority opinion).

　　Instead of applying *Tinker*'s speech-protective standards, the court below crafted a novel and permissive test that distorts the "material disruption" rule beyond recognition. The First Circuit identified a special category of speech, *i.e.*, speech that can be interpreted as demeaning a deeply rooted characteristic of personal identity. And if student speech, as interpreted by the school, falls into this category, the school may ban that speech if the school "reasonably forecast[s]" that it may have a "serious negative psychological impact on students with the demeaned characteristic." 103 F. 4th, at 873–874.

This rule cannot be squared with *Tinker*. The black armbands in that case also involved an emotionally charged topic, and the students in the Des Moines public schools were not somehow immune from those intense feelings. Justice Black made precisely this point in his dissent, writing: "Of course students . . . cannot concentrate on lesser issues when black armbands are being ostentatiously displayed in their presence to call attention to the wounded and dead of the war, some of the wounded and the dead being their friends and neighbors." 393 U. S., at 524; see also *id.*, at 518 ("[T]he armbands . . . took the students' minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war"). Indeed, a "former student of one of [the] high schools was killed in Viet Nam," and "[s]ome of his friends [were] still in school." *Id.*, at 509, n. 3 (majority opinion) (internal quotation marks omitted). The *Tinker* Court nevertheless held that this stress and these distractions did not trump the students' constitutional rights.

The First Circuit's test dilutes *Tinker* in other ways too. To name just a few, it defines "material disruption" to include anything that correlates with "a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school," whatever that means. 103 F. 4th, at 870 (internal quotation marks omitted). That is a highly permissive standard, and it certainly requires far less than that which *Tinker* suggested would constitute a "material disruption." See 393 U. S., at 508 ("aggressive, disruptive action"); *ibid.* ("threats or acts of violence on school premises"); *ibid.* ("group demonstrations"); cf. *Mahanoy*, 594 U. S., at 192–193.

Further, the First Circuit's test demands that a federal court abdicate its responsibility to safeguard students' First Amendment rights and instead defer to school officials' assessment of the meaning and effect of speech. The court below, for example, deferred to the School administrators'

determination that L. M.'s shirts conveyed a message that demeaned others' personal identity. 103 F. 4th, at 879–880. That court also deferred to the administrators' speculation about the likely effects of the t-shirts on students—even though L. M.'s speech resulted in no actual disruptions, and even though NMS "was not aware of any prior incidents or problems caused by th[e] [shirts'] message[s]." *Id.*, at 882. That approach defies *Tinker*, in which we performed our own "independent examination of the record" without trusting school administrators' self-serving observations. 393 U. S., at 509.

*Tinker*'s "material disruption" standard is demanding by design. That is because free speech is the rule, not the exception. The First Circuit's test flips that principle on its head.

## C

One final point deserves comment. The First Circuit repeatedly emphasized that L. M.'s speech occurred in a middle school where children ranged in age from 10 to 14 years old—a point respondents echo in their brief in opposition. That should not make a difference. Mary Beth Tinker was a 13-year-old student in junior high school, yet the *Tinker* Court applied the same "material disruption" test to her as it did to the 15- and 16-year-old high school petitioners, John Tinker and Christopher Eckhardt. See *id.*, at 504. If a school sees fit to instruct students of a certain age on a social issue like LGBTQ+ rights or gender identity, then the school must tolerate dissenting student speech on those issues. If anything, viewpoint discrimination in the lower grades is more objectionable because young children are more impressionable and thus more susceptible to indoctrination.

ALITO, J., dissenting

\*　　\*　　\*

　"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton* v. *Tucker*, 364 U. S. 479, 487 (1960). So long as the First Circuit's opinion is on the books, thousands of students will attend school without the full panoply of First Amendment rights. That alone is worth this Court's attention. The problem, however, runs deeper: as this case makes clear, some lower courts are confused on how to manage the tension between students' rights and schools' obligations. Our Nation's students, teachers, and administrators deserve clarity on this critically important question. Because the Court has instead decided to let the confusion linger, I respectfully dissent.