COLORADO COURT OF APPEALS                                      2016COA166

---

Court of Appeals No. 14CA2210
Boulder County District Court No. 14JD140
Honorable Ingrid S. Bakke, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of R.C.,

Juvenile-Appellant.

---

JUDGMENT REVERSED

Division II
Opinion by JUDGE HARRIS
Ashby, J., concurs
Webb, J., dissents

Announced November 17, 2016

---

Cynthia H. Coffman, Attorney General, Kevin E. McReynolds, Assistant
Attorney General, Denver, Colorado, for Petitioner-Appellee

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Porter-Merrill,
Deputy State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1    R.C., a fourteen-year-old middle school student, took a photo of his friend, L.P., and then drew a penis over the photo.  He showed the doctored photo to L.P. and some other friends.  L.P. reported R.C. to the principal, who called the police.  The police charged R.C. with disorderly conduct and, after a bench trial, the court adjudicated R.C. a delinquent.

¶ 2    On appeal, R.C. challenges the sufficiency of the evidence, arguing, primarily, that the prosecution failed to prove that his display of the photograph tended to incite an immediate breach of the peace.  We agree and therefore reverse.

## I.    Background

¶ 3    During class one afternoon, R.C. used his cell phone to take a photo of L.P.  Then, using the mobile application Snapchat, he drew a picture of an ejaculating penis next to L.P.'s mouth.[1]  R.C. showed

---

[1] Snapchat is a popular mobile application that allows cell phone users to send photos and videos to their friends or contacts.  Once the photo or video is sent to another person and viewed, it automatically deletes within a few seconds.  However, the user can save a photo for up to twenty-four hours using the "Snapchat story" feature.

the altered photo to L.P. and three other friends.  R.C. was "giggling" when he showed the other boys the photo.  One of the other boys laughed too, but L.P. felt "bad."  About five minutes later, class ended and the boys went to lunch.

¶ 4 In the cafeteria, a few other students looked at the photo and laughed, which made L.P. feel even worse.  Two of L.P.'s friends told R.C. to apologize and R.C. agreed to, but when he approached L.P., L.P. pushed R.C. away.  L.P. and his friends reported the incident to the principal later that day.

---

The app has another feature that allows the cell phone user to use a finger to draw or write over the photo with what looks like a marker or a crayon.  Figure 1 shows the Snapchat drawing app on a cell phone; Figure 2 is an example of a finished product.

Figure 1 Figure 2

 

*See* Appamatix, *3 Best Snapchat Secrets of 2014*, October 12, 2014, available at http://appamatix.com/3-best-snapchat-secrets-2014/; Daily Mail, *Now You Can Make Your Own Snapchat Lenses*, July 21, 2016, available at http://www.dailymail.co.uk/sciencetech/article-3701038/Now-make-Snapchat-lenses-Fun-Face-Paint-feature-lets-draw-selfies.html.

¶ 5     R.C. was charged with disorderly conduct, and the case proceeded to trial.  The court ruled that R.C. knew that his drawing would make L.P. feel humiliated and ashamed and would have tended to incite an immediate breach of the peace, in large part because the drawing implied that L.P. was "homosexual or behaves in that kind of behavior or has some sort of demeanor about that." The court sentenced R.C. to three months of probation, therapy, and eight hours of work crew.

## II.     Discussion

¶ 6     A person commits disorderly conduct if he or she "intentionally, knowingly, or recklessly: . . . [m]akes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace."  § 18-9-106(1)(a), C.R.S. 2016.

¶ 7     R.C. contends that the prosecution failed to prove beyond a reasonable doubt every element of the offense of disorderly conduct. According to R.C., his drawing was protected speech because, consistent with the First Amendment, only "fighting words" are prohibited under the statute, and the altered photo did not qualify as fighting words.  Even if it did, R.C. says, the prosecution failed to

prove that he knew, or recklessly disregarded a substantial risk, that displaying the photo was likely to provoke an immediate, violent response.[2]

## A.     Standard of Review

¶ 8      On a challenge to the sufficiency of the evidence, we review the record de novo to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is both "substantial and sufficient" to support the defendant's guilt beyond a reasonable doubt. *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). In applying this test, "we must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence." *People v. Atencio*, 140 P.3d 73, 75 (Colo. App. 2005). And we will not disturb the fact finder's determinations of

---

[2] R.C. also contends, for the first time on appeal, that the disorderly conduct statute requires proof of an *actual* breach of the peace, rather than proof that the display *tended* to incite a breach of the peace, and that the prosecution failed to prove that element as well. We need not decide the standard of review to apply in the event of an error because we perceive no error. The statute requires that the obviously offensive display "tend[] to incite an immediate breach of the peace." *People in Interest of K.W.*, 2012 COA 151, ¶ 29 (quoting § 18-9-106(1)(a), C.R.S. 2016). Whether a breach of the peace actually occurs "is not determinative of a violation." *Id.* at ¶ 32.

4

witness credibility and the weight to be given to the evidence. *People v. McIntier*, 134 P.3d 467, 471 (Colo. App. 2005).

### B.    Analysis

¶ 9    The United States and Colorado Constitutions prohibit the enactment of laws abridging or impairing freedom of speech.  U.S. Const. amend. I; Colo. Const. art. II, § 10; *see also NAACP v. Button*, 371 U.S. 415, 444-45 (1963) (The "Constitution protects expression . . . without regard . . . to the truth, popularity, or social utility of the ideas and beliefs which are offered.").  Still, the constitutional prohibition is not absolute: courts have upheld the constitutionality of statutes that prohibit obscenity, *see Miller v. California*, 413 U.S. 15 (1973); libel, *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964); incitement, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969); invasion of substantial privacy interests of the home, *see Rowan v. U.S. Post Office Dep't*, 397 U.S. 728 (1970); and, as relevant here, "fighting words."  *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942).

¶ 10    Fighting words are those "which by their very utterance tend to incite others to unlawful conduct or provoke retaliatory actions amounting to a breach of the peace."  *Hansen v. People*, 190 Colo.

457, 461, 548 P.2d 1278, 1281 (1976), *superseded by statute*, Ch. 227, sec. 1, § 18-9-106(1)(a), 1981 Colo. Sess. Laws 1010, *as recognized in People v. Smith*, 862 P.2d 939, 942 n.6 (Colo. 1993). To qualify as speech likely to incite a breach of the peace, it is not enough that words, gestures, or displays "stir[] the public to anger," "invite dispute," or "create a disturbance"; they must "produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949); *see also Gooding v. Wilson*, 405 U.S. 518, 525 (1972) (stating that "opprobrious" and "abusive" words that convey disgrace and include harsh insulting language are not necessarily fighting words).

¶ 11     Colorado's disorderly conduct statute is narrowly drawn to ban only "fighting words," as that term has been interpreted by our supreme court and the United States Supreme Court. *See Hansen*, 190 Colo. at 461, 548 P.2d at 1281 (to pass constitutional muster, the disorderly conduct statute may prohibit only "fighting words").

¶ 12     Citing *Chaplinsky*, the dissent defines fighting words to include words that by their very utterance "inflict injury," and it then appears to endorse R.C.'s conviction on the theory that the

6

photo amounted to bullying that was likely to inflict injury on L.P. But soon after *Chaplinsky*, the Supreme Court either dropped the "inflict injury" category of fighting words altogether or recited the full definition of fighting words without further reference to any distinction between merely hurtful speech and speech that tends to provoke an immediate breach of the peace. *See Purtell v. Mason*, 527 F.3d 615, 623 (7th Cir. 2008) (discussing the evolution of the fighting words doctrine). The Supreme Court has "never held that the government may, consistent with the First Amendment, regulate or punish speech that causes emotional injury but does *not* have a tendency to provoke an immediate breach of the peace." *Id.* at 624; *see* Note, *The Demise of the* Chaplinsky *Fighting Words Doctrine: An Argument for its Interment*, 106 Harv. L. Rev. 1129, 1129 (1993) ("The jurisprudential history of the *Chaplinsky* doctrine has led some commentators to conclude that the Court has sub rosa overruled the entire fighting words doctrine, or at least the 'inflict injury' prong."). In any case, the Colorado statute does not prohibit utterances, gestures, or displays that "inflict injury," but only those that "tend[] to incite an immediate breach of the peace." § 18-9-106(1)(a).

¶ 13    The question, then, is not, as the dissent suggests, whether L.P. might have suffered reputational injury, or, as a "highly sensitive" middle schooler (as most middle schoolers are), might have become "upset" by the photo, *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 674 (7th Cir. 2008), but rather whether R.C.'s display of the doctored photo tended to incite an immediate breach of the peace; that is, whether the display was, "as a matter of common knowledge, inherently likely to provoke a violent reaction" from a reasonable person. *Coggin v. State*, 123 S.W.3d 82, 90 (Tex. App. 2003) (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

¶ 14    As a preliminary matter, we must disagree with the dissent's characterization of the Snapchat photo as a "sexually explicit image of a minor" engaging in "fellatio." Under federal law, a "sexually explicit" image of fellatio is one that depicts "graphic . . . oral-genital" contact "between persons of the same or opposite sex." 18 U.S.C. § 2256 (2)(B)(i) (2012). The Snapchat photo was not introduced at trial and is not part of the record on appeal (because it was automatically deleted after some number of hours), but there was no testimony (or argument) that the photo depicted graphic

oral-genital contact between two people.  Instead, the evidence established that R.C. used the Snapchat app to hand draw a penis over an existing photo.  Saying that a hand-drawn, cartoon-like picture of a penis superimposed on a photo is a "sexually explicit image" of a minor engaging in fellatio is like saying that the picture contained in footnote 1 (Figure 2) is a graphic depiction of rhinoplasty.

¶ 15    So we turn to the issue of whether the cartoon drawing of a penis on a photo is likely to incite a reasonable person — or even a reasonable middle schooler[3] — to immediate physical violence.

---

[3] Protected speech is not transformed into "fighting words" by the peculiar sensibilities of the listener.  *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("Statements that while not fighting words are met by violence or threats or other unprivileged retaliatory conduct by persons offended by them cannot lawfully be suppressed because of that conduct."); *see also Street v. New York*, 394 U.S. 576, 592 (1969) (speech cannot be restricted simply because some listeners, "shocked" by the defendant's disrespectful conduct of burning a flag, might be "moved to retaliate" against him).  If First Amendment rights are subject to a middle schooler's "heckler's veto," the level of discourse might be limited "to that which would be suitable for a sandbox." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 875, 880 (1997) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 74-75 (1983)).  But even taking L.P.'s age into consideration, we do not believe violence would have been a reasonable response to R.C.'s display of the photo.

¶ 16　In this day and age, the notion that any set of words — much less a crayon-type drawing of a penis on a photograph — is "so provocative that [it] can reasonably be expected to lead an average [person] to immediately respond with physical violence is highly problematic." *State v. Tracy*, 130 A.3d 196, 209 (Vt. 2015). The cases cited at the outset of the dissenting opinion make this very point: words alone, no matter how offensive or cruel, cannot justify violence. And, as the Vermont Supreme Court has pointed out, that is a principle people ordinarily learn as children:

> In a society in which children are admonished to 'use your words' rather than respond to anger and frustration by physically lashing out — and are taught the refrain, 'Sticks and stones will break my bones, but words will never hurt me,' as an appropriate response to taunts — the class of insults for which violence is a reasonably expected response, if it exists at all, is necessarily exceedingly narrow.

*Id.* at 209-10.

¶ 17　That the category of "fighting words" has been shrinking is obvious — the Supreme Court has overturned every single fighting words conviction it has reviewed since *Chaplinsky* was decided in 1942. *Id.* at 205; *see also* Burton Caine, *The Trouble With "Fighting Words": Chaplinsky v. New Hampshire is a Threat to First*

*Amendment Values and Should be Overruled*, 88 Marq. L. Rev. 441, 536 (2004).

¶ 18    The district court concluded that the drawing constituted fighting words because its display would tend to make the subject of the photo feel humiliated and ashamed. But speech that embarrasses or disgraces another is insufficient to qualify as fighting words. Even vulgar and insulting speech that is likely to arouse animosity or inflame anger, or even to provoke a forceful response from the other person, is not prohibited. "The fact that speech arouses some people to anger is simply not enough to amount to fighting words in the constitutional sense." *Cannon v. City & Cty. of Denver*, 998 F.2d 867, 873 (10th Cir. 1993). Rather, fighting words are limited to "speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline." *Tracy*, 180 A.3d at 210.

¶ 19    Our position would not change even if we believed, as the district court apparently did, that the photo might have implied that L.P. was gay. Indeed, this assumption was the basis of the court's ruling: if R.C. had drawn a mustache or a big nose on the photo, the court explained, it would not have amounted to disorderly

11

conduct, even, presumably, if the big-nose photo had hurt L.P.'s feelings. But R.C. drew a picture that was "sexual [in] nature" and went "directly to [L.P.'s] gender being male," which made the photograph much more offensive, according to the court; so much so that, upon seeing the photo, L.P. would reasonably have been incited to violence.

¶ 20 We discern two problems with the court's reasoning. First, there was, in fact, no evidence that R.C. intended to imply that L.P. was gay or that L.P. perceived the photograph as any sort of commentary on his sexual orientation.

¶ 21 Second, even if we assume such commentary, we cannot conclude that, as a matter of law, the mere insinuation that a person is gay amounts to "fighting words." We disagree with the district court, and the dissent, that the suggestion of homosexuality or homosexual conduct is so shameful and humiliating that it should be expected to provoke a violent reaction from an ordinary person.

¶ 22 In any event, the words — or the display of the Snapchat photo in this case — cannot be evaluated in a vacuum; context is critical. "[A] defendant's words are considered as a 'package' in

12

combination with conduct and physical movements, viewed in light of the surrounding circumstances." *In re Welfare of M.A.H.*, 572 N.W.2d 752, 757 (Minn. Ct. App. 1997); *see also People in Interest of K.W.*, 2012 COA 151, ¶ 30 ("The context or circumstances in which the language is used must also be considered."). Thus, whether speech or a display constitutes fighting words must be determined on a case-by-case basis, considering all of the particular facts and circumstances. *Conkle v. State*, 677 So. 2d 1211, 1215 (Ala. Crim. App. 1995); *see also Texas v. Johnson*, 491 U.S. 397, 409 (1989) ("[W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression . . . .").

¶ 23     With this standard in mind, we have been unable to uncover any authority to support the proposition that a mere statement that someone is a homosexual or engages in homosexual conduct (assuming the meaning ascribed to the photo by the district court and the dissent) constitutes fighting words. *See also K.W.*, ¶ 34 (affirming juvenile's conviction for disorderly conduct where evidence showed more than juvenile's single utterance of offensive

words; rather, juvenile was threatening to harm other students, "she was hostile" — requiring security guard to intervene, and she "repeatedly yelled the base obscenities at the security officer in an aggressive manner"); *cf. Gilles v. State*, 531 N.E.2d 220, 221-23 (Ind. Ct. App. 1988) (holding that the defendant's loud and boisterous shouting at large group of people that they were "fuckers," "sinners," "whores," "queers," "AIDS people," and "scum of the earth" who were going to hell, which occurred at a festival where alcohol was served and continued despite police officers' repeated requests for the defendant to stop, constituted disorderly conduct). We note, however, that the display of swastikas during a march through a community inhabited by Holocaust survivors — a display that many might consider more likely to incite a violent response than a hand-drawn picture of a penis — has been held not to amount to "fighting words." *Village of Skokie v. Nat'l Socialist Party of Am.*, 373 N.E.2d 21, 25-26 (Ill. 1978). Nor could the City of St. Paul use its disorderly conduct statute to ban a defendant's conduct of burning a cross on a black family's lawn. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992).

¶ 24    Here, the circumstances surrounding R.C.'s display of the photograph do not support the finding that the display was likely to lead to immediate violence.  To begin, R.C. and L.P. were friends. R.C.'s display was not accompanied by any hostile, aggressive, or threatening language or conduct.  When R.C. showed L.P. and the other boys the altered photo, they were in a classroom where, presumably, a teacher was nearby and available to intervene or mediate if tempers flared or feelings were hurt.  There was no evidence that R.C.'s display of the photo caused any sort of commotion or that it was even noticed by other children or the teacher.  And, the display did not, in fact, arouse an immediate violent response from L.P.; instead, L.P.'s immediate reaction was to shrug off the incident, by pretending to laugh along with his friends.  *See M.A.H.,* 572 N.W.2d at 757-58 (fact that the target of alleged fighting words does not retaliate is relevant to question of whether speech constitutes fighting words, but is not determinative); *see also Purtell,* 527 F.3d at 625 (noting that display was present for weeks without causing any disruption and emphasizing that, to qualify as fighting words, the speech must

"have a tendency to provoke an average person to commit an *immediate* breach of the peace").

¶ 25    The dissent misunderstands our position, insisting that we have concluded that case law does "not support treating references to sexual orientation as fighting words." Our position, though, is simply that, under the circumstances presented in this case, R.C.'s display of the photo did not amount to fighting words because it was not likely to incite an immediate breach of the peace. We certainly have not foreclosed the possibility that, under other circumstances, references to a person's sexual orientation might indeed rise to the level of fighting words.

¶ 26    Adopting the district court's reasoning, and undaunted by the absence of any aggravating circumstances, the People argue for the first time on appeal that the photo was akin to R.C. calling L.P. a "cocksucker," a term that by its mere utterance qualifies as fighting words. We are not persuaded.

¶ 27    The requirement that we consider the language in context means that we must also evaluate its harshness in the current climate: "what may have constituted 'classical fighting words' in 1942 might comprise nothing more than an innocuous expression"

today.  *Svedberg v. Stamness*, 525 N.W.2d 678, 683 (N.D. 1994).

Indeed, in *Chaplinsky*, the Court deemed it incontrovertible that the language at issue — "damn racketeer" and "damn Fascist" — would tend to incite a breach of the peace.  315 U.S. at 574.  We have no difficulty concluding that those terms would qualify for First Amendment protection in 2016.

¶ 28    The word "cocksucker" is not an innocuous expression; it is vulgar and profane.  But uttering the word is not a crime unless its mere utterance would tend to provoke a reasonable person to immediately retaliate with violence.  The People point us to three cases, the most recent of which is nearly twenty-five years old, in which courts upheld disorderly conduct convictions where one of the words spoken was "cocksucker."  *See City of Little Falls v. Witucki*, 295 N.W.2d 243 (Minn. 1980); *State v. Broadstone*, 447 N.W.2d 30 (Neb. 1989); *City of Shaker Heights v. Marcus*, No. 61801, 1993 WL 27676 (Ohio Ct. App. 1993).  But in each of those cases, the words (which included more than "cocksucker") were accompanied by violent or threatening gestures.  In *Marcus*, for example, the defendant was described as "extremely agitated, loud, [and] combative."  1993 WL 27676, at *1.  Witnesses thought he

might "use force against" the bank manager. *Id.* In *Broadstone*, the defendant not only cursed at the witness, but also assaulted him with a stick. 447 N.W.2d at 32-33. And in *Witucki*, the court characterized the defendant's speech as threatening because it scared the victim who was working alone in a bar. 295 N.W.2d at 244.

¶ 29 Later cases from these jurisdictions make clear that the decisions turned on the totality of the circumstances, particularly the threatening nature of the defendant's speech and conduct. *See City of Chillicothe v. Lowery*, No. 97 CA 2331, 1998 WL 396316, at *5, *7 (Ohio Ct. App. 1998) (discussing disorderly conduct cases in Ohio, including *Marcus*, and concluding that "[i]n all of the cases upholding convictions for disorderly conduct involving profane language, the courts found that the profanity was used in a situation that likely could have become violent"); *see also M.A.H.*, 572 N.W.2d at 757 (citing *Witucki* and noting that "[e]very speech-related disorderly conduct conviction upheld by Minnesota appellate courts since [1978] has involved either an explicit verbal or physical threat of violence or a situation where the victims were placed in fear of imminent physical harm").

18

¶ 30    Thus, even if we otherwise found these cases persuasive, their facts are distinguishable from the circumstances presented in this case.

¶ 31    In any event, more recent cases suggest that "cocksucker" has lost its former incendiary quality.[4]  *See People v. Pierre-Louis*, 927 N.Y.S.2d 592, 593 (N.Y. Dist. Ct. 2011) (holding that defendant's tirade against district attorney, in which he stated that district attorney was a "piece of shit faggot fucking cock sucking cock," did not constitute fighting words); *ARMCO, Inc. v. United Steelworkers of Am.*, No. 2002CA0071, 2003 WL 22300027, at *7 (Ohio Ct. App. 2003) (holding that the insult "Afro cock sucker" was "mere words" and would not tend to incite immediate violence); *see also State v. Swoboda*, 658 S.W.2d 24, 25, 27 (Mo. 1983) (though unpleasant, the words used by defendant — "motherfucker" and "cocksucker" —

___

[4] The word also appears to have entered our coarsened political discourse.  In August 2016, the Governor of Maine, Paul LePage, left a profanity-laden voicemail for a state legislator in which he called the legislator a "little son of a bitch, socialist cocksucker" and lamented that he could not challenge the legislator to a duel.  Eric Russell & Scott Thistle, *LePage Effectively Endorses Racial Profiling in Maine's Battle Against Drug Addiction*, Portland Press Herald, Aug. 26, 2016, https://perma.cc/5A6F-JMUF.  We are reluctant to hold a middle school student to a higher standard than the Governor of Maine.

are "by no means uncommon" and constitute "everyday street language") (citation omitted); *State v. McKenna*, 415 A.2d 729, 732 (R.I. 1980) ("[A] group of people with normal sensibilities would not likely retaliate against a woman who called them [cocksuckers] and made wild, idle threats.").

¶ 32    In light of the surrounding circumstances, we conclude that the crude, sophomoric Snapchat photo does not rise to the level of "fighting words."  A middle school student of average sensibilities and maturity might have told R.C. that the photo was not funny, as L.P.'s friends did, or reported the hurtful conduct to a school administrator, as L.P. and his friends did later that day.  But the average person — even an average fourteen-year-old — would not be expected to fly into a violent rage upon being shown a photo of himself with a penis drawn over it.  R.C.'s display simply does not fall within the "exceedingly narrow" class of insults for which violence is a reasonably expected response.

¶ 33    Our decision does not leave the school without a remedy for inappropriate student behavior.  A school administrator may, consistent with the First Amendment, discipline a student for broadcasting vulgar and offensive speech.  *See Bethel Sch. Dist. No.*

*403 v. Fraser*, 478 U.S. 675, 685 (1986) (students' First Amendment rights are circumscribed in light of special characteristics of the school environment).  And Colorado, like most states, has an anti-bullying statute that gives schools the specific authority to prescribe consequences for conduct that satisfies the definition of bullying.  *See* § 22-32-109.1, C.R.S. 2016.

¶ 34    In sum, we agree with R.C. that his display of the altered photo did not amount to fighting words.  Accordingly, the government failed to prove an element of the offense.

¶ 35    In light of our resolution of the first question, we need not reach the second question — whether the evidence was sufficient to prove that R.C. knew, or recklessly disregarded a substantial risk, that his display would result in an immediate breach of the peace.

### III.    Conclusion

¶ 36    The judgment of conviction is reversed.

JUDGE ASHBY concurs.

JUDGE WEBB dissents.

JUDGE WEBB, dissenting.

¶ 37    Because the image that R.C. created depicting L.P. is not in the record and the trial court did not make detailed findings, exactly what it looked like is indeterminable.  But for two reasons, my sufficiency review assumes that the image showed L.P.'s face with an adjacent ejaculating penis pointing at his open mouth.[1]

¶ 38    First, L.P. testified that R.C. had taken a picture of him with his mouth open.  A student who saw a later version of this image testified that it showed L.P. with a penis drawn "on his face" which was "[p]ointing more towards his mouth."  That student also testified that the penis was ejaculating because "there was stuff coming out of it."  Another student testified that the image had a penis "[t]owards [L.P.'s] face" and "the penis was [ejaculating] . . . because there were . . . white lines everywhere."

¶ 39    Second, even if the record leaves any reasoned doubt about exactly what the image depicted — which to my reading it does not

_____

[1] The majority's characterization of the image as "cartoon-like" has no support in the record.  And in any event, the law also gives legal effect to cartoons.  *See, e.g.*, *Yorty v. Chandler*, 91 Cal. Rptr. 709, 711 (Cal. Ct. App. 1970) ("A cartoon, of course, remains subject to the law of libel and, like any other form of depiction or representation, it may be found libelous if it maliciously presents as fact defamatory material which is false.") (citation omitted).

22

— the content of the image must be treated in the light most favorable to the prosecution. *People v. Taylor*, 131 P.3d 1158, 1164 (Colo. App. 2005).

¶ 40 No one who appears before us suggests that such a sexually explicit image of a minor is innocuous.[2] Even so, the novel question of whether a photograph, (or here, a digital image), as opposed to spoken words, even constitutes fighting words must be answered.[3] If so, the remaining question is whether this particular image was reasonably likely to provoke a violent response by L.P. Because I would answer both questions "yes," I respectfully dissent.

## I. For First Amendment Purposes, Does A Digital Image Trigger the Fighting Words Doctrine?

¶ 41 True enough, the picture of L.P. with an ejaculating penis superimposed near to or touching his face does not fit the traditional model of fighting words because no words were included.

---

[2] "'Sexually exploitative material' means any photograph . . . that depicts a child engaged in, participating in, observing, or being used for explicit sexual conduct." § 18-6-403(2)(j), C.R.S. 2016.

[3] Other cases to have addressed non-spoken fighting words include *Texas v. Johnson*, 491 U.S. 397 (1989) (flag burning), *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (cross burning), and *World Wide Street Preachers' Fellowship v. City of Owensboro*, 342 F. Supp. 2d 634 (W.D. Ky. 2004) (picture of aborted fetus).

Still, "one picture is worth a thousand words."  *People v. Sepeda,*
196 Colo. 13, 22, 581 P.2d 723, 730 (1978).

¶ 42     Not surprisingly, then, pictures have legal significance.  For
example, the law of libel, which also balances First Amendment
interests, has long recognized that a photograph can be as
defamatory as a printed word.  *See Knapp v. Post Printing & Publ'g
Co.,* 111 Colo. 492, 496, 144 P.2d 981, 983-84 (1943) ("A definition
of libel which has received general acceptance and approbation is to
be found in 33 American Jurisprudence, page 38, section 3.  It
reads: 'A libel is a malicious publication, expressed either in
printing or writing or by signs *and pictures . . . .*'") (emphasis
added).  As well, tort law gives effect to pictures.  *See, e.g., Ford
Motor Co. v. Lemieux Lumber Co.,* 418 S.W.2d 909 (Tex. Civ. App.
1967) (holding that sales brochure with pictures of truck capable of
crossing streams and ditches and climbing mountains could be
construed as an express warranty).

¶ 43     I do not perceive any doctrinal ground on which to avoid
balancing the fighting word exception against First Amendment
rights merely because a picture is at issue.

¶ 44    Acknowledging that forms of communication other than spoken words may convey fighting words also reflects the evolving nature of how we communicate. Today, communication — especially among the young — has become increasingly digital and visual. *See Doninger v. Niehoff*, 594 F. Supp. 2d 211, 223 (D. Conn. 2009) ("[S]tudents are connected to each other through email, instant messaging, blogs, social networking sites, and text messages."), *aff'd in part and rev'd in part*, 642 F.3d 334 (2d Cir. 2011).[4]

¶ 45    For these reasons, I would apply the fighting words doctrine to test whether the penis image of L.P. enjoys First Amendment protection.

---

[4] *See* Mary-Rose Papandrea, *Student Speech Rights in the Digital Age*, 60 Fla. L. Rev. 1027, 1037 (2008) ("Rather than harass their classmates in the locker room, hallways, and bathrooms, students engage in 'electronic aggression,' often in the form of malicious rumors or humiliating or threatening speech spread on social networking sites, e-mails, instant messages, chat rooms, text messages, and blogs."); *see also People in Interest of T.B.*, 2016 COA 151, ¶ 93 n.3 (Fox, J., dissenting) ("The cell phone is the most direct and most widely used mode of communication between young people. Seventy-one percent of teens own a cell phone and seventy-six percent of teens have sent text messages — in fact, of teens with cell phones, twenty-five percent of teens aged twelve to fourteen text daily and fifty-one percent of teens aged fifteen to seventeen text daily.").

## II. Did the Image of L.P. Constitute Fighting Words?

¶ 46 Everyone would agree that "[t]he unprotected category of speech called 'fighting words' is an extremely narrow one." *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003). Such words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). And "[t]he potential to elicit an immediate violent response exists only where the communication occurs face-to-face or in close physical proximity." *City of Billings v. Nelson*, 322 P.3d 1039, 1045 (Mont. 2014).

¶ 47 But how great must be the risk of a violent response? To determine whether a communication includes fighting words, "the inquiry is not whether a reasonable person 'might' react violently, but instead whether someone in the circumstances of the addressee would likely react violently in the context in which the words were spoken." *In re Nickolas S.*, 245 P.3d 446, 452 (Ariz. 2011). At the same time, whether violence actually occurred is irrelevant, as a matter of law. *See State v. Parnoff*, 125 A.3d 573, 579 (Conn. App. Ct. 2015) ("To be considered 'fighting words,' the speech at issue need not actually cause those who hear the speech to engage in

26

'violent, tumultuous or threatening behavior,' but must have 'the tendency to provoke imminent retaliation' from them." (quoting *State v. Szymkiewicz*, 678 A.2d 473, 477-78 (Conn. 1996))) (*cert. granted in part* Nov. 30, 2015).[5]

¶ 48    So, what aspects of this case make such a violent response likely?  As the majority recognizes, the context must be considered. Three contextual factors leap out.

¶ 49    First, the record shows that R.C. was in close physical proximity to L.P., who could have immediately retaliated with a violent act.  Because of this proximity, displaying the image to L.P. differs from cases dealing with an electronic communication where no contemporaneous, in-person confrontation could have occurred. *See Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 496 F. Supp. 2d 587, 602 (W.D. Pa. 2007) ("A 'MySpace' internet page is not outside of the protections of the First Amendment under the fighting words doctrine because there is simply no in-person

---

[5] Based on this principle, which the majority recognizes, its statement that the image "did not, in fact, arouse an immediate violent response from L.P.," while factually correct, is legally inconsequential.

confrontation in cyberspace such that physical violence is likely to be instigated."), *aff'd in part*, 650 F.3d 205 (3d Cir. 2011).[6]

¶ 50　　Second, a contextual approach requires that the age of the listener be considered. *See Svedberg v. Stamness*, 525 N.W.2d 678, 684 (N.D. 1994) ("No one would argue that a different reaction is likely if a thirteen-year-old boy and a seventy-five-year-old man are confronted with identical fighting words."); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 674 (7th Cir. 2008) (adults "can handle such remarks better than kids can").

¶ 51　　Yet, the majority concludes that the image does not constitute fighting words because an "average person — even an average fourteen-year-old — would not be expected to fly into a violent rage upon being shown a photo of himself with a penis drawn over it." The majority relies on *State v. Tracy*, 130 A.3d 196, 209 (Vt. 2015),

---

[6] *See also State v. Drahota*, 788 N.W.2d 796, 804 (Neb. 2010) ("[E]ven if a fact finder could conclude that in a face-to-face confrontation, [defendant's] speech would have provoked an immediate retaliation, [the recipient] could not have immediately retaliated. [He] did not know who sent the e-mails, let alone where to find the author."); *but see Davidson v. Seneca Crossing Section II Homeowner's Ass'n*, 979 A.2d 260, 283 (Md. Ct. Spec. App. 2009) (Series of e-mails "consisted of the use of 'fighting words'" where they "regularly employed 'personally abusive epithets which . . . [were] . . . inherently likely to provoke violent reaction.'") (alterations in original) (citation omitted).

where the court explained that children are taught to use words "rather than respond to anger and frustration by physically lashing out."

¶ 52 The reasoning in *Tracy* falls short because it is at odds with capital and life without parole sentencing cases that recognize children's "lack of maturity and . . . underdeveloped sense of responsibility," coupled with their vulnerability to outside influences. *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). These cases also acknowledge that children's characters "are 'not as well formed.'" *Graham v. Florida*, 560 U.S. 48, 68 (2010) (quoting *Roper*, 543 U.S. at 569-70).

¶ 53 Consistent with the Supreme Court's observations on the infirmities of youth — as applied to fighting words — at least one court has held that "adolescent schoolchildren, are highly sensitive" and "easily upset by comments," such as those "about their race, sex, etc." *Nuxoll*, 523 F.3d at 671. This court explained that such

comments relate to "major components of [a person's] personal identity" and "can strike a person at the core of his being." *Id.*[7]

¶ 54    Based on these authorities, I believe that L.P.'s age makes a violent response more — not less — likely than if a similar penis image of an adult had been displayed to the adult. But the contextual inquiry does not end with age.

¶ 55    Third, the calculus of violence ratchets up even higher because some of L.P.'s peers were present and saw the image when R.C. displayed it to him. *Cf. City of Landrum v. Sarratt*, 572 S.E.2d 476, 478 (S.C. Ct. App. 2002) (One factor "to consider in determining if profanity constitutes fighting words [is] the presence of bystanders.").[8]

---

[7] In other contexts, the Supreme Court has found exceptions to First Amendment protections when the speech at issue involves minors. *See United States v. Stevens*, 559 U.S. 460, 471 (2010) ("[C]ategories of speech . . . fully outside the protection of the First Amendment" include child pornography because the state has "a compelling interest in protecting children from abuse.").

[8] Kathleen Hart, *Sticks and Stones and Shotguns at School: The Ineffectiveness of Constitutional Antibullying Legislation as a Response to School Violence*, 39 Ga. L. Rev. 1109, 1119 (2005) ("One researcher has found that peers witness approximately 85% of bullying episodes that occur at school. Bystanders may be active participants by encouraging other kids to fight, or passive participants by merely laughing and doing nothing, perhaps

¶ 56　　The majority also rejects the trial court's reasoning that the penis image conveyed fighting words because, according to the majority, the court incorrectly perceived the image as implying that L.P. was gay and more recent cases generally do not support treating references to sexual orientation as fighting words. That may be so, but the record is devoid of any evidence — such as accompanying statements by R.C. — from which a reasonable person standing in L.P.'s shoes would have taken the image as a reference to sexual orientation. And even assuming that the sexual orientation of such a person might be relevant, L.P.'s sexual orientation is unknown. Because of the barren record, gay bashing is only a straw man who suffers the predictable fate.

¶ 57　　In any event, whether the image constituted fighting words is a question of law subject to de novo review. *See Connick v. Myers*, 461 U.S. 138, 150 n.10 (1983) ("'[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they . . . are of a character which the principles of the First Amendment . . . protect.'

---

because they fear that they will be the bully's next victim.") (footnotes omitted).

Because of this obligation, we cannot 'avoid making an independent constitutional judgment on the facts of the case.'") (citations omitted). Given that the trial court's reasoning is not binding on appellate review, I decline to join the majority in dismembering it.

¶ 58        Returning, then, to whether the image showing L.P. engaged in fellatio constituted fighting words, based on the contextual factors discussed above, I am persuaded by the cases the Attorney General cites holding that the colloquial term "cocksucker" does not enjoy First Amendment protection under the fighting words doctrine. *See City of Little Falls v. Witucki*, 295 N.W.2d 243 (Minn. 1980); *State v. Broadstone*, 447 N.W.2d 30 (Neb. 1989); *City of Shaker Heights v. Marcus*, No. 61801, 1993 WL 27676 (Ohio Ct. App. 1993).[9] Although the majority distinguishes these cases as also including threatening conduct, "threats are not, for First Amendment purposes, treated identically with either fighting words or expression tending to incite imminent lawless action." *In re M.S.,*

---

[9] These cases are not alone in treating some sexually derogatory statements as fighting words. *See, e.g., State v. Groves*, 363 N.W.2d 507, 510 (Neb. 1985) (holding that "fuckhead" and "mother fucker" are fighting words, not constitutionally protected speech).

32

896 P.2d 1365, 1373 (Cal. 1995). As well, threatening conduct was not present here.[10]

¶ 59    With all of this in mind, I would hold that the image R.C. created and circulated showing an ejaculating penis adjacent to L.P.'s mouth constituted fighting words. Therefore, I would deny it First Amendment protection and affirm the judgment of conviction.

---

[10] The majority asserts that "more recent cases suggest that 'cocksucker' has lost its former incendiary quality." But the cases cited do not carry the weight that the majority places on them. For example, in *People v. Pierre-Louis*, 927 N.Y.S.2d 592, 595 (N.Y. Dist. Ct. 2011), the alleged fighting words were from voicemails, not face-to-face interaction. Similarly, in *State v. Swoboda*, 658 S.W.2d 24, 26 (Mo. 1983), the alleged fighting words were overheard by a neighbor, but the "conduct took place entirely on [the defendant's] own property and was not in any way directed towards the complainant." And in *State v. McKenna*, 415 A.2d 729, 731 (R.I. 1980), the defendant "addressed her remarks to a group of five men. She spoke to them as a group, not individually nor face-to-face." Finally, in *ARMCO, Inc. v. United Steelworkers of America*, No. 2002CA0071, 2003 WL 22300027, at *7 (Ohio Ct. App. 2003), the court was "unable to determine" if "Afro cock sucker" constituted fighting words.